**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 16-cv-02627-CMA

OWEN HILL,
SCOTT ROMANO, and
COLIN PHIPPS

      Plaintiffs,

v.

WAYNE W. WILLIAMS, in his official capacity as Colorado Secretary of State,
CYNTHIA H. COFFMAN, in her official capacity as Colorado Attorney General, and
MITCH MORRISSEY, in his official capacity as Denver District Attorney,

      Defendants.

                               AND

Civil Action No. 16-cv-02649-CMA

CARYN ANN HARLOS
KIYOMI BOLICK
ANDREW MADSON, and

      Plaintiffs,

v.

MITCH MORRISSEY, in his official capacity as Denver District Attorney,
WAYNE W. WILLIAMS, in his official capacity as Colorado Secretary of State, and
CYNTHIA H. COFFMAN, in her official capacity as Colorado Attorney General,[1]

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR
PRELIMINARY INJUNCTION**

---

[1] Although these cases were filed separately and have not been consolidated, the two cases involve the same issues and the Court held a joint evidentiary hearing. Accordingly, the Court issues a single opinion addressing both cases.

On October 24, 2016, Plaintiffs Owen Hill and Scott Romano filed a Verified Complaint for Declaratory and Injunctive Relief and Motion for Preliminary Injunction against Defendants Wayne W. Williams, Colorado Secretary of State, and Cynthia H. Coffman, Colorado Attorney General, both in their official capacities.  (Action No. 16-cv-02627, Doc. ## 1, 7, respectively.)  On November 1, 2016, Plaintiffs amended their complaint to add Colin Phipps as an additional Plaintiff and Mitchell R. Morrissey, Denver District Attorney, in his official capacity, as an additional Defendant.  (Action No. 16-cv-02627, Doc. # 22.)  On October 25, 2016, Plaintiffs Caryn Ann Harlos, Kiyomi Bolick, and Andrew Madson filed a Verified Complaint for Declaratory and Injunctive Relief and a Motion for a Temporary Restraining Order and Preliminary Injunction against the same three defendants.  (Action No. 16-cv-02649, Doc. ## 1, 6, respectively.)

Currently before the Court are Plaintiffs Hill, Romano and Phipps' and Plaintiffs Harlos, Bolick and Madson's Motions for Preliminary Injunction.  On October 31, 2016, Defendants filed responses to both motions (Action No. 16-cv-02627, Doc. # 21; Action No. 16-02649, Doc. ## 22, 23) and on November 1, 2016, Plaintiffs filed replies in both actions (Action No. 16-cv-02627, Doc. # 26; Action No. 16-02649, Doc. # 26.)

On November 3 and 4, 2016, the Court held a two-day evidentiary hearing on the motions.  The Court heard argument from counsel and testimony from witnesses for both Plaintiffs and Defendants.  For the reasons outlined below, the Court grants in part and denies in part the motions.

## I.   **BACKGROUND**

In Civil Action No. 16-cv-02627 (hereinafter the "2627 Action"), Plaintiffs seek a preliminary injunction "enjoining Defendants Wayne Williams and Cynthia Coffman from enforcing Colo. Rev. Stat. § 1-13-712(1) against the photographing of one's own ballot and display of such photographs outside of polling places."  (Doc. # 7-2.)  In Civil Action No. 16-cv-02649 (hereinafter the "2649 Action"), Plaintiffs seek a preliminary injunction "prohibiting Defendants from having Plaintiffs arrested, having Plaintiffs summonsed, or prosecuting Plaintiffs or any similarly situated individuals for engaging in constitutionally-protected conduct that violates Colorado Revised Statute § 1-13-712."  (Doc. # 6 at 1.)[2]

Colorado Revised Statute § 1-13-712(1) prohibits a voter from "show[ing] his ballot after it is prepared for voting to any person in such a way as to reveal its contents."  Section § 1-13-712 was passed in 1891 and most recently amended in 1980. Any person who violates this statute is guilty of a misdemeanor and can be punished by a fine of not more than one thousand dollars, and/or by imprisonment in the country jail for not more than one year.  Colo. Rev. Stat. § 1-13-712(4); Colo. Rev. Stat. § 1-13-111.

Colorado uses an all mail-in ballot election.  Every registered voter who registered to vote on or before October 31, 2016, has received a mail-in ballot to complete at home.  Individuals who did not register by that date are allowed to register

---

[2]  In the 2649 Action, Plaintiffs challenge the constitutionality of § 1-13-712(3), which provides that "[n]o election official, watcher, or person shall reveal to any other person the name of any candidate for whom a voter has voted or communicate to another his opinion, belief, or impression as to how or for whom a voter has voted."  This Court agrees with Defendants that this statute does not prohibit a voter from revealing the contents of his own ballot, and thus this Court will not address this issue.

at the polling places and vote up to, and including, Election Day.  Moreover, voters who

have obtained ballots in the mail are still allowed to vote in person on Election Day.

The Deputy Secretary of State testified that in 2012, Colorado did not have an all

mail-in ballot system, but rather a system where voters could request a mail-in ballot.  In

2012, seventy-five percent of voters signed up to receive a mail-in ballot for that election

and all future elections.  In 2012, 2.9 million Coloradans voted, of which 750,000 voted

in person.  In 2014, 2.1 million Coloradans voted, of which 100,000 voted in person.

The Deputy Secretary of State testified that she anticipates between 100,000 and

750,000 Coloradans will vote in person on November 8, 2016.

It appears that these lawsuits were both precipitated by the following news

release issued by the Denver District Attorney on October 20, 2016:

### REMINDER: BALLOT SELFIES ARE ILLEGAL IN COLORADO

Denver District Attorney Mitch Morrissey is reminding voters that there is a
state law prohibiting voters from showing their completed ballot to others.
This would include posting your completed ballot on social media.

Colorado is one of many states that ban a ballot selfie. The law, found at §
1-13-712 in the Colorado Revised Statutes, states that, "No voter shall
show his ballot after it is prepared for voting to any person in such a way
as to reveal its contents." It is a misdemeanor violation.

The prohibition on sharing completed ballot results is an effort to guard
against potential voter fraud.

http://www.denverda.org/News_Release/Releases/2016%20Release/Ballot%20s
elfies.pdf.

Plaintiffs wish to take photographs of their completed ballots and post them on

social media but believe they are prevented by § 1-13-712 from doing so.  Specifically,

Plaintiff Owen Hill, a State Senator from Colorado Springs, testified that he intends to

vote in person on Election Day, take a photograph of himself and his children with his completed ballot, and post it on social media.  His intent in posting this picture is to encourage his supporters to vote.  Plaintiff Caryn Ann Harlos, the Communications Director for the Libertarian party, testified that she wishes to post a video showing her completing her ballot.  However, she is afraid of being prosecuted under § 1-13-712.  Plaintiff Scott Romano is an eighteen-year-old, first time voter, who is registered to vote in Littleton.  He testified that he would like to use Snapchat to reveal the contents of his vote.  He notes that individuals in his age group have the lowest voter turnout, and he believes that Snapchat is an important tool to encourage young people to vote.  Plaintiff Colin Phipps is a Colorado resident who currently lives in Denver and intends to vote by mail prior to the general election.  Mr. Phipps would like to engage in "ballot selfie" activity in the upcoming election and future elections.  Plaintiff Kiyomi Bolick is a voter in Denver County and a Public Defender in Adams County.  She testified that she posted a photograph of her ballot on Facebook, and after being called a "criminal" on Facebook by an attorney employed in the Colorado Attorney General's Office, she removed her post.  Plaintiff Andrew Madson is a voter in Denver County.  He took a photograph of himself with his ballot, sent the photograph to a few family members, and had planned to post it on social media until he learned about the existence of the law.

Each of the Plaintiffs testified that they are registered to vote and receive mail-in ballots.  Plaintiff Hill testified that he plans to vote at his local polling place.  The remaining Plaintiffs intend to vote at home using their mail-in ballots and do not intend to take a "selfie" at the polling place.

In response to Plaintiffs' Motions for Preliminary Injunction, Defendants submitted the following affidavits and declarations from representatives of the Colorado Attorney General's Office and several district attorneys' offices, which encompass the jurisdictions in which each of the Plaintiffs lives:

1. A declaration from Joseph Morales, the Chief Deputy District Attorney in the Economic Crimes United with the District Attorney's Office for the Second Judicial District, in which he declares that District Attorney Morrissey will not charge anyone with an offense under § 1-13-712(1) unless there is evidence that the act was in connection with a violation of another elections code provision.  (Action No. 16-cv-02649, Doc. ## 23-6, 22-1.)

2. An affidavit from Scott Turner, the Deputy Attorney General for the Criminal Justice Section of the Colorado Department of Law, in which he attests that, to his knowledge, the Colorado Department of Law has never charged anyone for taking a photograph or video of a completed ballot and posting it on social media.  He also avers that his office would not charge any such activity unless it were accompanied by evidence of vote buying, vote selling, coercion, or other type of undue influence.  Finally, he avers that his office will not initiate criminal charges for citizens voluntarily posting photographs of their completed mail-in ballots on the internet, showing them to others, or otherwise disclosing them.  (Action No. 16-cv-2649 Doc. # 23-3.)

3. An affidavit from Richard Orman, the Chief Elections Law Prosecutor for the Eighteenth Judicial District, in which he avers that, as a matter of policy, the District Attorney for the Eighteenth Judicial District will not charge anyone with an offense of C.R.S. § 1-13-712(1) for taking a photograph or video of a completed mail-in ballot and making public or otherwise revealing that photograph, or the ballot itself, unless there is evidence that the act was in connection with a violation of another elections code offense. (Action No. 16-cv-2627, Doc. # 23-4.)

4. An affidavit from Dan May, the District Attorney for the Fourth Judicial District, in which he confirms that his office has never charged anyone under C.R.S. § 1-13-712(1) for taking a photograph or video of a completed ballot and posting it on social media or otherwise publicizing it.  He also attests that his office would not charge any such activity unless it were accompanied by some aggravating factor such as vote buying, vote selling, coercion or any other type of undue influence and

6

that his office will not initiate criminal charges for citizens voluntarily posting photographs of their completed mail-in ballots on the internet, showing them to others, or otherwise disclosing them. (Action No. 16-cv-2627 Doc. # 23-5.)

5.  An affidavit from Dave Young, the District Attorney for the Seventeenth Judicial District, in which he avers that, to his knowledge, his office has never charged anyone under § 1-13-712 for taking a photograph or video of a completed ballot and posting it on social media or otherwise publicizing it.  He avers that, absent evidence of vote buying, vote selling, coercion, or any other type of undue influence, his office would not initiate criminal charges for citizens voluntarily posting photographs of their completed main-in ballots on the internet, showing them to others, or otherwise disclosing them. (Action No. 16-cv-2649 Doc. # 28.)

## II.   <u>STANDING AND MOOTNESS</u>

### A. Standing

Defendants contend that Plaintiffs lack standing to pursue this case.  This Court disagrees.  Because Plaintiffs facially challenge § 1-13-712(1) as being overly broad in violation of the First Amendment, standing requirements are more lenient.  Indeed, "[i]t is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable."  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992).  The Supreme Court has recognized that this leniency is "based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court."  *Id*.

To establish Article III standing, a plaintiff must show that he has (1) suffered an injury in fact that is (2) traceable to the defendants and (3) redressable by a favorable

ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "In freedom of expression cases, injury in fact can be shown by alleging (1) an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and (2) a credible threat of prosecution." *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007). "To satisfy the injury in fact requirement, the plaintiff must demonstrate that expressive activities will be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." *Id.* (citation omitted).

Defendants' sole contention is that Plaintiffs have not demonstrated a credible threat of prosecution because the Attorney General and various district attorneys have disavowed any intent to prosecute under the challenged statute.  In support of their argument, Defendants rely on three Tenth Circuit cases.  *See D.L.S. v. Utah*, 374 F.3d 971 (10th Cir. 2004); *Winsness v. Tocom*, 433 F.3d 727 (10th Cir. 2006); *Mink*, 482 F.3d 1244.

In *D.L.S.*, the plaintiff alleged that he had engaged in, and intended again to engage in, acts prohibited by Utah's sodomy statute.  He therefore filed suit to challenge the constitutionality of that statute.  374 F.3d at 973.  In response, one prosecutor averred in an affidavit it was "doubtful" that the county would bring sodomy charges against the plaintiff for his past or future sexual activities as described in the complaint. *Id.* at 974.  A second prosecutor submitted an affidavit stating "he [would] not file charges against [the plaintiff] for the kind of sexual activity [the plaintiff] intends to practice."  *Id.*  The Tenth Circuit concluded that the plaintiff lacked standing to sue

because (1) he could not show a real threat of prosecution "in the face of assurances of non-prosecution" and (2) "any lingering threat of prosecution that might have survived the prosecutors' affidavits ha[d] . . . been snuffed out by the Supreme Court's . . . decision invalidating Texas' sodomy statute." *Id.*

In *Winsness*, the district attorney's office charged the plaintiff with flag abuse for burning a symbol onto an American flag and hanging it from his garage. 433 F.3d at 729. The district attorney dismissed the charges before trial. *Id.* at 730. Plaintiff then filed a 42 U.S.C. § 1983 suit, seeking to enjoin enforcement of Utah's flag-abuse statute, arguing it violated the First and Fourteenth Amendments. *Id.* In response, a district attorney signed an affidavit declaring that he had no intention of prosecuting anyone under the statute because its constitutionality was doubtful. *Id.* at 731. The Tenth Circuit affirmed the district court's finding that the plaintiff lacked standing because the threat of prosecution had been eliminated by this assurance. *Id.*

In *Mink*, 482 F.3d at 1248, the police department investigated plaintiff for alleged violations of a Colorado law that made it "criminal libel" to knowingly publish any statement tending to "impeach the honesty, integrity, virtue, or reputation or expose the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, or ridicule." As with the instant case, the plaintiff filed suit, levying a facial challenge to the statute as an unconstitutional violation of the First Amendment. *Id.* at 1248. Early in the suit, however, the police investigation against him terminated and the district attorney's office disavowed any intent to prosecute the case. *Id.* at 1255. The district court dismissed the case for lack of standing and the Tenth Circuit affirmed,

concluding that "a plaintiff cannot retain standing where the prosecutor immediately concludes that the statute cannot be constitutionally enforced." *Id.*

These cases are distinguishable from the instant case. Although, like here, all three involved the written assurances by government attorneys that they would not enforce challenged laws, those assurances were bolstered either with an opinion by the United States Supreme Court (*D.L.S.*) or an admission by state prosecutors (*Winsness* and *Mink*) recognizing some constitutional defect in the challenged law. That has not occurred here. The Supreme Court has not weighed in on the constitutionality of statutes proscribing "ballot selfies," and the Defendants in this case maintain that the challenged law is constitutional. Defendants' resolute belief that the statute is constitutional, in spite of their recent averments, amounts to a Sword of Damocles for Plaintiffs or any Colorado voters living in fear of prosecution. Indeed, Mr. Morales' affidavit plainly indicates that it is merely "the exercise of prosecutorial discretion and judgment" that ensures Denver will not prosecute Plaintiffs, not an agreement that the statute is unconstitutional. (Doc. # 23-6 at 4.) This Court will not conclude, in light of the pervasive uncertainty surrounding the law, that the Plaintiffs in this case are unreasonable to fear the specter of prosecution.

The Court also notes that the Plaintiffs in the 2649 Action brought suit for the benefit of themselves and "any similarly situated individuals for engaging in constitutionally-protected conduct that violates" § 1-13-712. (Action No. 16-cv-2649 Doc. # 6 at 1.) While issues of third-party standing did not feature in the briefs submitted by the parties or the arguments made before the Court, the standing analysis

in this case necessarily extends beyond the named Plaintiffs.  Litigants may challenge a statute not only because their own rights of free expression are violated, but also "because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, (1973).  "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).  The statute at issue here implicates a most fundamental exercise of the First Amendment right to speak in and about our elections.  It affects voters from every corner of Colorado.  We cannot know whether the assurances against prosecution extended incident to this lawsuit will be received or understood by those unnamed citizens the Plaintiffs today represent.  In the absence of a clear statement from this Court, the threat of prosecution will be especially real.

Even assuming *arguendo* that there is no credible threat of future prosecution, the Court concludes that Plaintiffs have established an injury in fact by showing an objectively reasonable fear of "other consequences following from the statute's enforcement." *Mink*, 482 F.3d at 1253.  Plaintiffs demonstrate numerous "other consequences" stemming from the enforcement of this law, including deleterious professional repercussions.  For example, Plaintiff Kiyomi Bolick testified that, after posting a picture of her ballot on Facebook, she received a warning from an employee at the Attorney General's office that she had violated § 1-13-712 and an email from her

employer reminding her of the law's provisions.  Further, the Secretary of State admitted

to referring a number of complaints to the Denver District Attorney's office for

prosecution.  While the District Attorney avers that he will not prosecute any cases

under § 1-13-712, he has not assured this Court, or the Plaintiffs, that he will refrain

from an invasive investigation or coercive "request" that violators delete their ballot

"posts," both of which could chill the exercise of the First Amendment right to speech.[3]

Moreover, multiple Plaintiffs testified that posting an unlawful image of a completed

ballot would violate the end user license agreements of several leading social media

websites, opening them to the possibility of an account termination, which could

significantly hamper personal and business interests and hamstring political organizing

via social media during a critical phase of the election.

In consideration of the foregoing, this Court finds that Plaintiffs have

demonstrated a sufficient injury in fact to establish standing.  The Court also finds that

the injury is traceable to Defendants—who are responsible for enforcing the law—and

redressable by a favorable ruling—one that would prevent that enforcement.

### B. Mootness

Defendants also argue this suit is moot.  The law is clear that "an actual

controversy must be extant at all stages of review, not merely at the time the complaint

is filed." *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016).  However, as the

Tenth Circuit has explained, there are two exceptions to the mootness doctrine—that is,

---

[3] Defendants' declarations indicate that there have not been any criminal prosecutions under the statute, but testimony revealed that the means by which the statute has been enforced are invasive investigations or coercive requests that violators delete their ballot posts.

"situations in which a case remains subject to federal court jurisdiction notwithstanding the seeming extinguishment of any live case or controversy." *Id*. at 1166.  The relevant exception in this case concerns "voluntary cessation" of the defendant's conduct.  Under this exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012).  The rule is designed to prevent gamesmanship. *Brown*, 822 F.3d at 1166.  If voluntary cessation automatically mooted a case, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* (citation omitted).

A defendant's voluntary cessation may moot a case, however, if the defendant carries "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. (citation omitted). The Supreme Court has described this burden as "heavy," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007), and "stringent," *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv's (TOC)*, Inc., 528 U.S. 167, 189 (2000).  "But the burden is not insurmountable, especially in the context of government enforcement." *Brown*, 822 F.3d at 1167.  "In practice, [this] heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 (10th Cir. 2010).  Where courts decline to moot a controversy following a government officials'

voluntary cessation, the decisions "rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways." *Id*. at 1117 (brackets and emphasis in original) (quoting 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 3533.6, at 311 (3d ed.2008)).

Relying on *Brown*, Defendants contend that this case is moot because the prosecutors who have authority to file criminal charges against Plaintiffs have indicated that they will not file a case under § 1-13-712(1) if Plaintiffs merely take and publish photos of their completed ballots.  In *Brown*, the Tenth Circuit reviewed a district court decision finding portions of Utah's bigamy statute unconstitutional.  822 F.3d at 1154–55, 1159–60.  The Browns are a plural family, and Mr. Brown is legally married to one wife and "spiritually married" to three other "sister wives."  *Id*. at 1156.  After the airing of a reality television show featuring the Brown family, the local police department opened an investigation pursuant to Utah's bigamy statute.  *Id*.  Because the Browns feared prosecution, they moved to Nevada.  *Id*.  They then filed suit in Utah federal district court, asserting that the bigamy statute infringed on their First and Fourteenth Amendment rights.  *Id*. at 1155–57.  In response, the Utah County Attorney adopted a formal policy providing that it would prosecute individuals for bigamy only in certain limited circumstances, which did not apply to the Browns.  *Id*. at 1155.  The district court denied the Utah County Attorney's second motion to dismiss the case as moot, finding that the County Attorney had adopted the new policy strategically just to render the case moot and that the policy could be reversed in the future by a successor County Attorney.  The Tenth Circuit reversed the district court's decision, holding that once the

Utah County Attorney's Office adopted the new policy, there was no longer a live dispute between the parties.

This Court finds *Brown* distinguishable.  First, the prosecutor in *Brown* adopted a formal policy that applied state wide.  Indeed, the Tenth Circuit noted that, if the County Attorney "had announced only that his office had decided not to prosecute the Browns, the question of mootness would be closer." *Id*. at 1171.  In this case, prosecutors from some, but not all, of Colorado's judicial districts have indicated their intent not to prosecute, but there was no evidence that they have adopted a formal policy to that effect.  Second, the Tenth Circuit in large part relied on the Browns' relocation to Nevada and their intent not to return to Utah to support a finding that they faced no credible threat of prosecution, rendering the case moot. *Id*.  Moreover, Utah's statute of limitations to prosecute the Browns was four years, and they had lived out-of-state for more than five years. *Id*. at 1173–74.  The statute of limitations has not run here, nor have the Plaintiffs abandoned the state.

*Brown* instructs that indicia of reluctant cessation by the government counsel against a decision to moot a suit. *Id*. at 1167.  In this case, this Court interprets the Defendants' steadfast commitment to the constitutionality of the underlying statute, in spite of their averments disclaiming prosecution, as evidence of reluctant cessation.  For this reason, and for the legitimate uncertainty concerning whether harms could be repeated in subsequent elections, this Court declines to find this suit moot.

## III.     THE *PURCELL* PRINCIPLE

Citing to *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and *Crookston v. Johnson*, No. 16-2490, 2016 WL 6311623 (6th Cir. Oct. 28, 2016), Defendants argue that this Court should not grant any injunctive relief because such an order would alter existing election laws and procedures just before an election.

In *Purcell*, the United States Supreme Court, explaining that "[a] State indisputably has a compelling interest in preserving the integrity of its election process," reversed the Ninth Circuit Court of Appeals' injunction, which precluded the State of Arizona from enforcing Proposition 200's identification requirements on the eve of the election.  *Id*. at 4.  The case stands for the general proposition that courts will not disrupt imminent elections absent a powerful reason to do so.  The Supreme Court in *Purcell* explained that "[a] State indisputably has a compelling interest in preserving the integrity of its election process."  *Id*. at 4.

In *Crookston*, the law being challenged forbade a voter from showing his marked ballot to any person other than his minor child or a person lawfully assisting him. *Crookston*, 2016 WL 6311623 at *1.  In accordance with this law, the Michigan Secretary of State issued instructions to the local election officials banning the use of cell phones and video cameras in the polling places.  *Id*.  The Sixth Circuit was faced with a district court's order that enjoined the Secretary of State from enforcing its rules at polling places.  The Sixth Circuit granted the Secretary's request for a stay of the district court's injunction noting that "courts will generally decline to grant an injunction

to alter a State's election procedures" when an election is "imminent and there is 'inadequate time to resolve factual disputes.'" *Id*. at *2 (internal quotations omitted).[4]

In this case, Plaintiffs specifically stated at the hearing that they do not seek an injunction that would require any change to either the Secretary of State's or any of the local County Clerk's rules concerning the upcoming election, nor do they seek to enjoin these rules.

This Court heeds the Supreme Court's warning not to disrupt imminent elections by narrowly crafting its injunction and refusing to enjoin the Secretary of State.  This Court has no intention of disrupting the upcoming election in Colorado.  Indeed, it is exactly for this reason that the Court has narrowly tailored its injunction to ensure that it does not alter existing election laws or rules.  Furthermore, it has not enjoined the Secretary of State in any way and its injunction does not affect procedures or rules at polling places.  Specifically, if local rules at polling places prohibit the use of cameras due to privacy concerns, nothing in this Court's Order prohibits the enforcement of those rules.[5]  Thus, this Court finds that the concerns raised in *Crookston* are not present in this case.

---

[4] This Court agrees with *Crookstone* that "timing is everything." 2016 WL 6311623 at *1. However, because this Court is not interfering with the election, timing is not an issue in this case.  Moreover, Plaintiffs in this case testified that they were not aware of the law's existence until the Denver District Attorney issued a press release reminding voters about this law on October 20 and they commenced this lawsuit a mere four days later.  Joseph Morales, the Chief Deputy District Attorney with the Denver District Attorney's Office, confirmed that he did not believe Coloradans were aware of the existence of the law, which is the reason he issued the press release.

[5] The Deputy of Secretary of State testified that some, but not all, local polling places and service centers prohibit the taking of photographs or videos.  That decision is made by the local County Clerks and nothing in this Order affects the enforcement of those rules.

## IV.    PRELIMINARY INJUNCTION ANALYSIS

In order to secure a preliminary injunction, a movant must demonstrate: (1) irreparable injury will result if the injunction does not issue; (2) a substantial likelihood of success on the merits; (3) the threatened injury to the movant outweighs any damage the injunction may cause the opposing party; and (4) issuance of the injunction would not be adverse to the public interest.  *Derma Pen, LLC v. 4EverYoung Ltd*., 773 F.3d 1117, 1119 (10th Cir. 2014).  In examining these factors, courts have consistently noted that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1260 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc*., 903 F.2d 904, 907 (2d Cir. 1990)).  The movant then bears the burden to demonstrate that each subsequent factor tips in its favor.  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).

Defendant Mitch Morrissey contends that this Court should subject Plaintiffs' application for a preliminary injunction to heightened scrutiny.  Indeed, the Tenth Circuit has held that in three disfavored categories of cases (mandatory preliminary injunctions; preliminary injunctions that afford the movant all the relief that it could recover; and preliminary injunctions that alter the status quo), a court must apply a heightened standard.  *SCFC ILC, Inc. v. Visa USA, Inc*., 936 F.2d 1096, 1098–99 (10th Cir. 1991).  This Court is not issuing a mandatory preliminary injunction, but a prohibitive one.  See

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260–61 (10th Cir. 2005) (an injunction is

mandatory when it affirmatively the non-movant to act in a particular way).  Nor does the

narrowly crafted injunction entered in this case grant Plaintiffs all of the relief that they

seek.  Assuming that the Court is, however, altering the status quo by issuing a court

order prohibiting the enforcement of the statute, the Court holds Plaintiffs to making a

strong showing both with regard to the likelihood of success on the merits and with

regard to the balance of harms.

### A.  Irreparable Injury

Where First Amendment rights are at issue, "'[t]he loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury.'"  *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v.

Burns*, 427 U.S. 347, 373–74 (1976)).  Indeed, "[w]here a plaintiff alleges injury from a

rule or regulation that directly limits speech, the irreparable nature of the harm may be

presumed."  *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349

(2d Cir. 2003).

In this case, Plaintiffs allege that they have silenced themselves under threat of

criminal penalties and that, if an injunction is not issued, it will result only in further

irreparable harm.  Thus, irreparable harm is presumed.  *Id*.  Further, Plaintiffs have

suffered irreparable harm because they have had their free speech rights chilled.  *See

e.g., Elam Const., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343, 1347 (1997) (affirming

district court's injunction against enforcement of RTD resolution allowing the resolution

to remain in effect would chill plaintiff's First Amendment rights, thus constituting an irreparable harm to their interests).

In addition to the evidence concerning Plaintiffs themselves, there was evidence presented that other Coloradans have likewise had their speech chilled.  Kyle Forti, Plaintiffs' expert and Chief Operating Officer of a public relations firm, testified that he wanted to take a ballot selfie but because of the law, instead took a picture of his sealed ballot.  He also testified that some of his clients, who are members of the Colorado Assembly, took down their social media posts with pictures of their completed ballots once they became aware of the law.

**B. Substantial Likelihood of Success on the Merits**

The First Amendment prohibits the government from making any law "abridging the freedom of speech."  U.S. Const. amend. I.  The First Amendment applies with equal force to state laws and regulations through the Fourteenth Amendment. U.S. Const. amend. XIV.  Plaintiffs allege that Colorado Revised Statute § 1-13-712(1) violates the constitutional guarantee to free speech by threatening Plaintiffs and all Colorado voters with fines and imprisonment merely for taking a photo of their filled out ballot, commonly known as a "ballot selfie," and displaying that photo on any public media.

*1.    Level of Scrutiny to Be Applied*

Courts apply varying levels of scrutiny depending on whether the First Amendment restrictions at issue are content-based restrictions or content-neutral restrictions.  Content-based restrictions must survive strict scrutiny.  *Reed v. Town of*

*Gilbert, Ariz.*, 135 S. Ct. 2218 (2015).   On the other hand, content-neutral restrictions

are subject to an intermediate level of scrutiny.   *Ward v. Rock Against Racism*, 491 U.S.

781, 791 (1989).   For purposes only of resolving these motions for preliminary

injunction, the Court applies the intermediate level of scrutiny applicable to a content

neutral law.   The Court reserves determination as to whether the law is content-neutral

or content-based until its ruling on the merits.

    2.   *Application of Intermediate Scrutiny*

    As asserted by Defendants, in order for § 1-13-712(1) to pass constitutional

muster under an intermediate scrutiny standard, it must further an important

government interest and be "narrowly tailored to serve [that] interest, and [] leave open

ample alternative channels for communication of the information."   *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 791 (1989).   Narrow tailoring does not require the

government to adopt the least restrictive means.   *See Ward*, 491 U.S. at 798-99.

However, it requires the government to show that it does not restrict "substantially more

speech than is necessary to further the government's legitimate interests", i.e., it "may

not regulate expression in such a manner that a substantial portion of the burden on

speech does not serve to advance its goals."   *Id*. at 798–99.

    Defendants in this case have identified voter fraud, and specifically vote buying

and voter intimidation as the governmental interests that § 1-13-712(1) serves.

Defendants' expert, Jeffrey Zachs, testified about the effect of voter verification on the

incentive to buy votes and the history of vote buying and intimidation in Colorado.   He

testified that the principle barrier to vote buying or intimidation is a reliable way to verify

that a person has voted in the agreed upon manner.  As such, without a means of

verification, it is more difficult to carry out voter fraud.  He explained that the advent of

cell phones made it fairly effortless to provide such verification.  He admitted, however,

that vote buying and voter intimidation largely disappeared during the twentieth century

and there is currently no record of extensive vote buying.  He hypothesizes, however,

that up to ten percent of voters could engage in vote buying if Colo. Rev. Stat. § 1-13-

712(1) did not exist.

No one disputes that reducing the risk of voter fraud, including vote buying, vote

selling, and voter intimidation is a significant governmental interest.  Therefore, for the

purposes of this analysis, the issue is whether § 1-13-712(1) is sufficiently narrowly

tailored to serve that governmental interest.

Section 1-13-712(1) prohibits a wide range of activities related to the publication

of the contents of a filled-in ballot, regardless of whether that publication has anything to

do with voter fraud.  It prohibits showing your completed ballot to any person, including

family matters, no matter the reason.  It also prohibits taking a photo of your ballot and

posting that photo on social media.  Despite the potentially broad array of conduct that it

captures, § 1-13-712(1) has no mens rea requirement related to the interest it

purportedly furthers – voter fraud.

In its declaration, the Colorado Attorney General, attested that the Colorado

Department of Law "has never charged anyone for taking a photograph or video of a

completed ballot and posting it on social media," that her "office would not charge any

such activity unless it were accompanied by evidence of vote buying, vote selling,

coercion or any other type of undue influence," and that "this office will not initiate

criminal charges for citizens voluntarily posting photographs of their completed mail-in

ballots on the internet, showing them to others, or otherwise disclosing them."  Similarly,

Defendant Morrissey submitted a declaration, stating that

> [b]ased on our review of the allegations in the Verified Complaint related
> to the past conduct of Ms. Bolick and Mr. Madson and the proposed future
> conduct of Ms. Harlos, Ms. Bolick, and Mr. Madson, none of those
> allegations indicate that any of the past or proposed future conduct
> involves any violation of any Colorado election law other than § 1-13-
> 712(1).  As a result, in the exercise of prosecutorial discretion and
> judgment, the District Attorney's Office for the Second Judicial District will
> not prosecute Ms. Bolick and Mr. Madson for their past conduct as alleged
> in the Verified Complaint and also will not prosecute Ms. Harlos, Ms.
> Bolick, and Mr. Madson if they engage in the proposed future conduct as
> alleged in the Verified Complaint, absent additional evidence that such
> conduct implicates a violation of other Colorado Election Laws.

(Doc. # 23-6.)  The other affidavits submitted provide similar averments.

These declarations, although made by the Defendants in an effort to defeat

standing and render the case moot, are concessions that violations of § 1-13-712(1)

alone (in the absence of a violation of another section of the election code such as vote-

buying) pose no material public concern.

Finally, this Court notes the legislature has passed other laws that address the

governmental interest in question and do so in a constitutional manner.  For example, it

is illegal

- to interfere with other voters, Colo. Rev. Stat. § 1-13-711;

- to induce a voter to show how he marked his ballot, Colo. Rev. Stat. § 1-13-712(2);

- to intimidate or coerce a voter, Colo. Rev. Stat. § 1-13-713;

- for an employer to attempt to control an employee's vote, Colo. Rev. Stat. § 1-13-719(1)(a); or

- to give or promise money or employment or any other consideration to induce someone to vote or refrain from voting or to vote for a particular person, Colo. Rev. Stat. § 1-13-720.

For these reasons, the Court finds that the Plaintiffs' have a substantial likelihood of success on the merits.

### C. Balance of Harms

In considering the balance of harms, we weigh the irreparable harm to the moving party with the harm an injunction would cause the opposing party.

Defendants have articulated a number of harms that may result in the event of an injunction.[6]  Because we are not enjoining the Secretary of State, these concerns do not come into play.  Moreover, during the hearing, the Deputy Secretary of State, Ms. Susan Staiert, testified that there would be minimal harm so long as this Court did not order her to change her Election Day procedures or hold that voters could always take photographs in the polling places.  The only harm she was able to identify if this Court were to issue an injunction enjoining prosecution of § 1-13-712(1) is that her office may have to field more calls concerning the effect of the Court's injunction and the current state of the law.

The Court finds that the harm created by extra phone calls to the Secretary of State do not outweigh important First Amendment rights of the citizens of Colorado.  As

---

[6] (1) Requiring new training for election judges, which will have a disruptive effect on tens of thousands of Coloradans will vote in person; (2) potentially requiring the alteration of the physical structure of voting booths; and (3) lengthening the wait time for people to vote because selfies will add 30 seconds or a minute to each voter's stay in the booth.  (Action No. 16-cv-2627, Doc. # 21 at 4.)

24

discussed above, the harm to Plaintiffs and other Colorado voters — the deprivation of

First Amendment free speech rights — is presumptively an irreparable harm.  *Elrod*, 427

U.S. at 373; *Verlo*, 820 F.3d at 1127.  The Court finds that there is no harm to the public

in precluding enforcement of § 1-13-720.  Indeed, the District Attorneys and the

Attorney General concede as much when they indicate an intention not to prosecute

ordinary violations of the statute.  In such circumstances, the balance of harms tips

strongly in favor of Plaintiffs.

### D. Public Interest

The final determination this Court must make is whether the public interest would

be served by entering the preliminary injunction.  At this point in the election cycle, the

electorate has received conflicting information concerning what conduct they can and

cannot engage in.  The District Attorney has issued a press release that states a voter

can be criminally prosecuted for taking a ballot selfie and posting it on-line.  On the

other hand, Defendants have submitted affidavits from some of the district attorneys

indicating that they do not intend to prosecute an individual for displaying their ballot

unless there is evidence of the violation of another election law.  By issuing an

injunction in this case, Coloradans get what they are entitled to—clarity on an issue that

implicates fundamental constitutional rights.  Thus, the Court finds that granting this

injunction is in the public interest.

### V.    CONCLUSION

After an extensive evidentiary hearing, this Court orders that Plaintiffs' motions

(Civil Action No. 16-cv-02627, Doc. # 7; Civil Action No. 16-cv-02649, Doc. # 6) are

GRANTED in part and DENIED in part, and that an injunction should issue in Civil Action No. 16-cv-02627 and Civil Action No. 16-cv-02649.

The Court therefore ORDERS that Defendants Mitch Morrissey, in his official capacity as District Attorney for the Second Judicial District, and Cynthia Coffman, in her official capacity as Colorado Attorney General, are enjoined from enforcing Colorado Revised Statute § 1-13-712(1) by prosecuting, referring for prosecution, and/or investigating violations thereof, or instructing any person to remove from publication any photograph or image of that person's voted ballot, unless such violations or publication is in connection with violations of other criminal laws.  Nothing in this Order shall alter the ability of Defendants or other officials to enforce any other laws, rules, or regulations related to the administration of the election, including those rules in effect at polling places.


DATED: November 4, 2016                    BY THE COURT:


                                           CHRISTINE M. ARGUELLO
                                           United States District Judge


26